[Civ. No. 4670. Third Appellate District.—June 30, 1932.]

In the Matter of the Guardianship of the Person and Estate of ALLEN TOWSON (an Incompetent Person).

S. M. Dobbins and Huston, Huston & Huston for Appellant.

Thos. E. Reynolds and A. G. Bailey for Respondent.

THOMPSON (R. L.), J.—This is an appeal from an order appointing a guardian of the person and estate of an alleged incompetent person under the provisions of section 1763 of the Code of Civil Procedure.  It is contended the evidence fails to support the findings of incompetency.

Upon petition of a brother of Allen Towson, the Bank of America National Trust & Savings Association was appointed guardian of his person and estate. The court found that the alleged incompetent person is "unable, unassisted to properly manage and take care of his property, and by reason thereof is likely to be deceived and imposed upon by artful or designing persons, and is mentally incompetent to manage his said estate".

The appellant is a farmer who resides at Vacaville. He is sixty-five years of age and a widower. His wife died about a year prior to the filing of the petition in the present proceeding. He has two brothers and a sister living near Vacaville. He was possessed of real and personal property of the approximate value of $10,000. "He had been very methodical in his habits, very conservative, with reference to money." During the last illness of his wife, in the fall of 1929, for the first time he met a practical nurse by the name of Mrs. Lillie L. Carr Cornelius. Apparently she was much younger than he and was unmarried. She attended the appellant's wife for two days before her death. Soon thereafter the appellant and Mrs. Cornelius began to associate. She exhibited considerable interest in him. The following fall his prostate gland was affected. He consulted a local physician. About November 8, 1930, he entered the Sutter Hospital at Sacramento, where he remained until January 1st. Under the care of Dr. Hart he was treated at the hospital and finally operated upon for the prostate gland affliction. During the time he was at the hospital he had full hospital care, including two professional nurses a part of the time. Immediately after he left the hospital he went into the home of Mrs. Cornelius at Vacaville, where he remained under her care and supervision for three months. He then became an inmate of the county hospital for a brief period, asserting that he did not have the means to pay for his care and treatment at a private institution. In company with Mrs. Cornelius and a married couple from Vacaville, he visited the Odd Fellows Home for Old Folks, with the purpose of becoming an inmate thereof. This institution is primarily intended for the care of impecunious members of the fraternal organization. In response to an inquiry as to who was seeking to

interest him in the old folks' home, he said, "They have all talked about it."

Before going to the Sutter Hospital the appellant drove over to Calistoga with Mrs. Cornelius. He saw her frequently. She visited his home before he went to the hospital. He said it was unnecessary for him to have been compelled to go to the Sutter Hospital. He claimed he was "railroaded to the hospital". He seemed to entertain an enmity against his brothers and sister. After his return from the hospital he was visited by one of his brothers and his sister. His home had been torn down, with the purpose of building a new one. This was done without consulting his relatives, and under the supervision of Mrs. Cornelius, who was then on the premises. She was a total stranger to his relatives. Without any criticism against her, and without assigning any reason therefor, he said: "A sister came out there that I didn't like. Now, I had a notion to order her off the place."

Before going to the Sutter Hospital, the appellant owned the Vacaville ranch, valued at about $8,000, subject to a $1500 mortgage. He also owned one-sixth interest in another 200-acre ranch. His wife died possessed of a small estate which was in the process of probating. He was the administrator of her estate. He owned a Willys-Knight automobile, and had in a bank about $1500 in cash. He gave his radio to a man that worked on his ranch. He gave his automobile to Mrs. Cornelius. He "told her to keep it, it was hers". He claimed to have hired her to drive to the Sutter Hospital daily to see him. She claimed to have done so, remaining with him about an hour each day. He agreed to pay her $2,500 for her services as his nurse. During the brief period of time she was presumed to be acting as his nurse, she was also engaged in nursing two other sick persons. He also executed and delivered to this nurse a bill of sale of all his farm implements and other personal property. He directed his home to be torn down and a new one built. His explanation for this sudden radical change, in spite of his serious illness, was that "it was not fit to be there, it was about to fall down". It was destroyed under the supervision of Mrs. Cornelius. He executed an absolute deed of his $8,000 ranch to the nurse. He claimed this was done only to secure the payment of the

promised sum of $2,500 for her services. He said: "I had to pay her." He had been a customer of the First National Bank of Vacaville. That bank held the $1500 mortgage on his ranch. He authorized Mrs. Cornelius to sell the ranch. She made a written agreement to do so through the cashier of the Bank of America. She was previously a customer of this bank. In this transaction "Mrs. Cornelius . . . did the talking". It was understood that in the event of the consummation of this sale, the $1500 mortgage was to be paid, and the balance of the purchase price was to be deposited in the bank "credited to the account of Mrs. Cornelius". He admitted "she had the right to draw on it".

During the time Mrs. Cornelius was dominating Mr. Towson's conduct, and procuring title to all of his property, he was a very sick man, and did not expect to live. His brother, Everett, testified that when he visited him after his return from the hospital, the appellant said: "I will never be a well man again. . . . The nurse has told me so and the doctor has told me so." The brother described his appearance at that time as follows: "He appeared to be very nervous and strained; his eyes were glassy and unnatural, and they had a fixed stare." He was unable to work. The appellant testified in that regard: "I feel all right, but my feet; and if I work all day I cannot get around, hardly. Q. Have you been working? A. A few hours' work, I have tried a little . . . around there on the flower garden where she (the nurse) lives. I have not done no real work since I came back."

Regarding the appellant's mental capacity, Mr. Ripley, a brother-in-law, testified that he thought there was something wrong with his mind. On cross-examination this colloquy occurred: "Q. Do you mean for us to understand that Mr. Towson has not sufficient intelligence to understand what he is doing, Mr. Ripley? A. Well, it looks that way to me. . . . Q. You do not intend to tell this court there is something wrong with Mr. Towson, do you? A. Well my opinion (is) there has been some undue influence used. . . . Q. I am asking you if you mean to tell Judge O'Donnell there has been anything mentally wrong with Mr. Towson . . . ? A. Well, I think there is. . . . I think there is something mentally wrong with him." With reference to appellant's mental condition, his brother Everett testified:

"Judging from his acts, I would say he is not competent." This opinion that he was incompetent was based upon the unnecessary and unreasonable transfer of all of his property to a woman who was almost a stranger to him, and who had no claims upon his bounty, whereas he had theretofore been very "methodical in his habits, and conservative with reference to money". His conduct was not that of a rational man.

· The foregoing acts and conduct of the appellant furnish an abundance of evidence to support the findings and order of the court to the effect that the appellant is unable, unassisted, to properly manage or control his property, and that he is likely to be deceived and imposed upon by artful and designing persons. It conclusively proves he was so deceived and defrauded. There is a conflict of evidence regarding the essential facts of this case. But the rule of evidence with respect to the sufficiency thereof which will sustain a finding of incompetency is exactly the same as that which applies to a civil action of any other character. This rule is stated in *Estate of Reed,* 198 Cal. 148 [243 Pac. 674], approving the language used in *Matter of Coburn,* 165 Cal. 202 [131 Pac. 352], as follows:

" 'The findings of the trial court upon disputed issues of fact are not to be overturned on appeal, unless they totally lack the support of substantial evidence. That rule is as applicable to a case of this character as to any other. It requires us to uphold the assailed finding if there is in the record evidence, which, with the aid of all inferences reasonably to be drawn from it, tends logically to establish the conclusion embodied in the finding.' "

The judgment is affirmed.

Parker, J., *pro tem.,* and Plummer, Acting P. J., concurred.